**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.   CRIMINAL ACTION NO. 3:09-00010

TIMOTHY OLDANI

**MEMORANDUM OPINION AND ORDER**

On February 2, 2009, the defendant pled guilty to a conspiracy to steal property from the Untied States Marine Corps and illegally export that property. The stolen items were night vision optics, designated by the President of the United States as items critical to a security or foreign policy interest of the United States by their placement on the U.S. Munitions List. As such, the defendant's base offense level was properly calculated by the probation officer, pursuant to U.S.S.G. § 2M5.2(a)(1), to be 26. As a result of acceptance of responsibility and the defendant's criminal history, the guideline range for sentencing was determined to be 46 to 57 months imprisonment. In response to a motion from the defendant, however, the Court varied from this guideline range and imposed a term of imprisonment of five months followed by a three year term of supervised release – including eight months community confinement. As explained below, the variance is justified by the fact that the sentencing commission acted outside its "characteristic institutional role" in setting the base offense level, the nature and circumstances of the defendant, and the defendant's need for medical care.

**Background**

**I.     Factual Description of the Defendant's Crime**

Timothy Oldani pled guilty to a conspiracy to steal property from the United States Marine Corps – namely, night vision optics – and to illegally export those items.  In 2007, Timothy's brother, Joseph Oldani, was an active duty member of the United States Marine Corps, stationed in King's Bay, Georgia.  One night, after he had been drinking, Joseph Oldani entered an attic in the barracks on base and stole night-vision rifle scopes, which were stored there.  Joseph called Timothy the next day and asked if Timothy could help him sell the scopes; Timothy agreed.  Joseph then transported the optics to Timothy, who sold them on the online auction site eBay.  It appears that the initial sales were successful and Joseph and Timothy conspired to steal and sell more optics from the Marine Corps barracks.  Timothy eventually took a large share in the more than $50,000 of profits he helped to generate.  He used some of the proceeds to make a  $12,000 down payment on a 2005 Cadillac CTS sedan and to purchase a $12,000 engagement ring and an $800 television.

In January 2008, Special Agent Andrew Dunphy, of the Defense Criminal Investigative Service (DCIS), observed some of the stolen optics for sale on eBay.  Posing as an interested buyer, he inquired of the seller – "faithtim84" – as to the status of the items.  In an email message to "faithtim84" he wrote, "I understand where this gear is probably coming from, but just want to make sure that the 'history' is clear – no one from the Marine Corps will come looking for it, will they?"  Presentence Investigation Report at ¶ 8.  He also asked about the requirement of a license to export such items.  "Faithtim84" responded, "I've never had a problem shipping out." *Id.*  The undercover officer ended up purchasing five of the stolen optics from "faithtim84"  – an online identity later found to belong to Timothy Oldani.  The investigation revealed that three of the stolen optics had been shipped to Taiwan, five to Japan, and one to Hong Kong.

Each of the stolen optics fits within a category of items specified on the United States Munitions List – a list of materials designated by the President of the United States and subject to export controls. A declaration by Colonel Kevin McDonnell, Director of the Washington Office of the Special Operations Command, describes the significance of these types of items and their presence on the munitions list. He explains that the ability to operate at night gives the United States a tactical advantage in fighting our enemies. The technology incorporated into the night-vision scopes stolen by the Oldani brothers supports this tactical superiority and is sought after by hostile forces. The advantage conferred by this type of equipment can be compromised when items are shipped out of the United States without proper export controls, such as the licensing requirements on exporters.

## II.     Description of the Defendant

Timothy Oldani is a Marine Corps veteran with combat experience. He served a tour of duty in Iraq in 2005 as a member of a reserve combat engineer platoon. As a member of the engineering platoon, Mr. Oldani was principally responsible for working with explosives. His platoon was tasked with clearing roadways of Improvised Explosive Devices ("IED's") fashioned to detonate on contact with United States or allied vehicles. Typically, Marines like Mr. Oldani eliminated roadside type IED's by placing charges and exploding them in place. In addition to clearing roadways, Mr. Oldani's platoon used its expertise in explosives to gain entry into secured buildings. When Marines needed to gain access to a building suspected of housing insurgents, they would frequently call upon combat engineers to blow out doors or walls and create an entryway. Because of the nature of these operations, combat engineers were forced to use explosives with short fuses and place themselves within close proximity of the blast. The combat engineer was proximately located to the explosion and, thus, was also one of the first soldiers to enter a building once he

created an ingress. This position at the front of the entry group was most vulnerable to enemy fire when the Marines encountered hostile forces.

In addition to the challenges of his normal duties, Mr. Oldani was also a participant in at least two extreme incidents. On March 21, 2005, Mr. Oldani was driving a Humvee for members of the 1st Platoon. An accompanying Humvee carried passengers from the 3d Battalion, 2d Marine Regiment, the infantry unit associated with Mr. Oldani's combat engineer's platoon. The two Humvees were serving as a roadblock when a vehicle-born IED (commonly referred to as a "car-bomb") drove into the Humvee carrying the infantrymen. The resulting explosion killed the driver and seriously wounded two passengers. Mr. Oldani was ordered to drive the wounded back to a battalion aid station – by way of a roadway frequently littered with IED's. In describing the situation, one of Mr. Oldani's commanders explained that time was of the essence and everyone simply had to hope for the best when Mr. Oldani left on the mission. Fortunately, Mr. Oldani arrived safely and the wounded Marines survived.

Another traumatic incident occurred on May 11, 2005, near the town of Ramana, Iraq. Mr. Oldani and his unit were on patrol when a lightly armored amphibious vehicle, used by Marines from the 3d Battalion, 25th Marine Regiment, struck a roadside IED. The Marines in the amphibious vehicle were part of a mortar team, and the explosion set off the mortar rounds inside. The Marines inside the vehicle were not able to escape because the top-hatch malfunctioned, and those outside were unable to assist because of the danger posed by the exploding rounds. Mr. Oldani and his unit could do nothing but watch as the six trapped soldiers burned alive.

According to all accounts, Timothy Oldani was deeply affected by his service in Iraq. When his unit deployed in March 2006 to Morocco, Mr. Oldani began to re-experience the stresses he suffered on his first tour of duty. He developed a compulsive tendency to rub his knuckles together

until they bled and at one time attempted suicide. On February 13, 2007, he wrote a letter requesting to be relieved from service. The Marine Corps discharged him honorably.

Although Timothy Oldani's military career ended in 2007, he continues to be severely affected by those experiences. He suffers Post Traumatic Stress Disorder ("PTSD"), tinnitus (or ringing of the ears), and has been diagnosed with mild traumatic brain injury ("TBI"). As a result of his PTSD and tinnitus, he has been given a 60 percent disability rating by the Veteran's Administration ("VA").[1] Although diagnosed with TBI, it has not been factored into his disability rating. According to the VA examiner who diagnosed him, Mr. Oldani exhibits poor judgment due to war zone trauma which overwhelms his thinking. In addition, Mr. Oldani shows other common effects of PTSD, including feelings of detachment, a sense of foreboding, persistent efforts to avoid thoughts or feelings about the trauma he experienced, and disturbing dreams. On December 23, 2008, Dr. James Petrick diagnosed Mr. Oldani with TBI. TBI is a brain injury caused by repeated rattling of the brain within the brain case. It is different from concussive type injuries because the brain does not actually strike the skull. Physical damage at the cellular level does, however, occur. It is difficult to diagnose because of the nature of physical damage, because it occurs in such a complex organ, and because the resulting symptoms are similar to that of PTSD (which frequently occurs in tandem). Dr. Pennick testified that although Mr. Oldani's expression of TBI is similar to the symptoms exhibited by those suffering only from PTSD, the severity of Mr. Oldani's symptoms cannot be explained by PTSD alone.

---

[1] This disability rating is a combination 50 percent disability for PTSD and 10 percent disability for tinnitus. At Mr. Oldani's sentencing one of his social workers, Julia McCown, testified that in her opinion he should have been assigned a disability rating for PTSD closer to 70%.

Timothy Oldani receives treatment for his service related disabilities from the VA. He attends groups sessions, with other PTSD afflicted veterans, about once a week. He sees his individual counselor, Julia McCown, MSW, approximately once a month. The VA prescribed medications to Mr. Oldani, but he has refrained from taking them: in part, because it is the drug used in his own suicide attempt and, in part, because it has been linked to recent unexplained deaths of other West Virginia veterans. Mr. Oldani explained during sentencing that he was afraid to take the drugs because of what it might do to him and because he could not risk hurting himself or his family.

Exacerbating the effects of Mr. Oldani's disabilities were the deaths of two Marines who served with Mr. Oldani in the months prior to the conspiracy. One, Andrew White, was one of the unexplained deaths described above. A second, Justin Thompson, was Mr. Oldani's fire team leader in Iraq. Justin was in direct command of Mr. Oldani, and primarily responsible for Mr. Oldani's duties and safety. Two of Mr. Oldani's commanders – Capt. James M. Davis, and Sgt. Stephen Huebschman – testified at sentencing that Mr. Oldani took these deaths hard and looked to be in rough shape at Justin Thompson's funeral.

Despite the hardships Timothy Oldani faced and continues to face because of his disabilities and this conviction, he has worked hard to make a life for himself. He is currently enrolled in a joint BA-MBA program at the University of Charleston, wherein he maintains a 3.8 GPA. The dean of the business school submitted video testimony in which he described Mr. Oldani as an impressive young man, with ambition and determination. He has recently become engaged and, from the letters submitted on his behalf and from his own statement, it is obvious that Mr. Oldani has strong support from his church and his family.

**Analysis**

In fashioning an appropriate sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a).[2] One of the primary considerations should always be the sentencing range established by the U.S. Sentencing Commission: in this case, 46 to 57 months. Here, however, other factors outweigh this consideration. First, the guideline range, as established by the commission, fails to take into account the particular circumstances of this defendant's crime. Second, the personal characteristics of the defendant warrant a sentence lower than the guideline range. Third and finally, the medical needs of this defendant justify a shorter prison term than that prescribed by the sentencing commission for this type of offense. The defendant has committed a serious crime and his hardships and military service do not excuse him from this. A prison term is warranted, but one of five months followed by an eight month term of community confinement is sufficient to meet the objectives of sentencing.

**I.      The U.S. Sentencing Commission Acted Outside Its Characteristic Role In Setting the Applicable Base Offense Level.**

The U.S. Sentencing Commission was tasked by Congress to provide guidelines that meet the sentencing objectives enunciated in 18 U.S.S.G. § 3553(a). *Rita v. U.S.* 551 U.S. 338 (2007). In carrying out its mission, "the Commission took an 'empirical approach,' beginning with an

---

[2]The statute directs the sentencing judge to consider the following:
(1) the offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution) (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution.
*Rita v. U.S.*, 551 U.S. 338 (2007).

empirical examination of 10,000 presentence reports setting forth what judges had done in the past and then modifying and adjusting past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions" etc. *Id.* This empirical approach is the essence of the sentencing commission's "charactersistic institutional role" to develop sentences consistent with the purposes of § 3553 without "choos[ing] among differing practical and philosophical objectives." *Rita,* 551 U.S 338.

There are times when the sentencing commission must act outside its characteristic role and suggest guideline ranges based on policy directives rather than on careful empirical research. A prime example of this can be seen in the guideline ranges for drug trafficking offenses. *See Kimbrough v. U.S.*, 552 U.S. 85 (2007). These guideline ranges are fashioned based on the weight driven schemes of the of the Anti-Drug Abuse Act of 1986 and to be consistent with the Act's mandatory minimum sentences. *Id.* As a result the policy choice to sentence crack cocaine much more harshly than the equivalent weight of powder is incorporated into the sentencing guideline range for crack cocaine offenses. *Id.* Recognizing that the sentencing commission acted outside its characteristic role in formulating the guidelines for crack cocaine offenses, the *Kimbrough* Court held that a district court did not abuse its discretion when it determined for a particular defendant that the "crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a) purposes, even in a mine-run case." *Id.*

As it did when it fashioned the guidelines for crack cocaine offenses, the sentencing commission acted outside its characteristic role in establishing the base offense level for Timothy Oldani's crime. The applicable guideline is found in § 2M5.2, "Exportation of Arms, Munitions, or Military Equipment or Services Without Required Validated Export License." The guideline provides two base offense levels: (1) an offense level 26 for all offenses not described in subsection

2; and, (2) a base offense level 14, "if the offense involved only non-fully automatic small arms, and the number of weapons did not exceed ten." U.S.S.G. § 2M5.2(a).

While the optics at issue here were sophisticated munitions which do not obviously fall within the category of "non-fully automatic small arms," it is also hard to place them within the same category as other items that would subject a defendant to a base offense level of 26. The U.S. Munitions list includes a broad array of technologies from "riflescopes manufactured to military specifications" to "Ballistic Missiles," "Warships," "Tanks and Military Vehicles," "Chemical Agents," "Biological Agents," and "Nuclear Weapons." Because the exception described in base offense level 14 only applies to non-fully automatic small arms, the base offense level of 26 within § 2M5.2 applies whether the items exported are night-vision optics, like those at issue here, or nuclear weapons.[3]

The base offense level of 26 was established during the 2001 amendments to the guidelines. As it was originally written, § 2M5.2(a) provided for "(1) 22 if sophisticated weaponry was involved; or (2) 14." U.S.S.G. § 2M5.2(a) (1987). It was amended in 1990 to read: "(1) 22, except as provided in (2) below; (2) 14, if the offense involved [less than ten] only non-fully automatic small arms. . ." This amendment was made to "better distinguish between the more and less serious forms of offense conduct covered." U.S.S.G. App. C. amend. 337 Amendment. A 2001 Amendment raised the default offense level from 22 to 26 to respond to a " a statutory provision expressing a sense of Congress . . . . that guideline penalties [were] inadequate for certain offenses

---

[3]As the government indicated during sentencing there are other statutes and sentencing guidelines that might apply if the items exported were nuclear weapons. The Court would note, however that the other most obvious other guideline is § 2M6.1: "Unlawful Activity Involving Nuclear Material, Weapons, of Facilities . . . ." If there is no intent to injure the United States or to aid foreign nations or foreign terrorists, then the highest applicable base offense level under § 2M6.1 is 28 – a mere two points higher than that prescribed by § 2M5.2.

involving the importation and exportation of nuclear, chemical, and biological weapons . . ." U.S.S.G. App. C amend. 633. The Congressional statement provided little guidance but plenty of discretion to the sentencing commission to fashion the increased penalties. Rather than adopting some specific offense characteristics (such as, the number of articles exported, their technical sophistication, the capability to cause harm, etc.), the commission simply raised the base offense four levels.

It is clear, by the divergent set of materials included within and the history and justification for the amendments, that the sentencing commission did not act within its "characteristic institutional role" when it established the current guidelines under § 2M5.2. It would be logical for there to be a sliding scale (such as exists for different drug types and weights) based on the lethal nature or technical sophistication of different munitions: no such scale exists, however. Further, it is clear that the increase in offense level from 22 to 26 was a result, not of empirical study, but a policy directive from Congress.

This Court is ill equipped to judge the sophistication of technology in the optics sold to Timothy Oldani in comparison to other items on the munitions list. The only evidence in the record relevant to such an inquiry – that declaration of Colonel McDonnell – makes clear that the night-vision technology is important to the U.S.'s military superiority its current conflicts and that it is sophisticated equipment. The optics are not, however, weapons of mass destruction equivalent to chemical or biological weapons or nuclear material. For this reason the Court has justification to vary from the base offense level of 26 and **FINDS** the appropriate base offense level to be 22: the level at which these items would have been included prior to the 2001 amendments. Retaining a 3-level decrease for acceptance of responsibility, this would place Mr. Oldani at an offense level of 19, or a recommended prison term of 30 to 37 months, prior to consideration of other § 3553 factors.

## II.     The History and Characteristics of the Defendant Justify a Substantial Downward Variance.

From all accounts, Timothy Oldani had a military career worthy of commendation and respect. He served in harsh conditions and witnessed brutal combat. Despite these obstacles he served with distinction, never shirking from duty and always performing at the best of his ability. Although military service is not usually taken into consideration for purposes of sentencing, *see* U.S.S.G. § 5H1.11, here the Court cannot ignore Timothy Oldani's exemplary service. It shows that despite the crime he committed, the defendant is a man of strong moral constitution who has already made valuable contributions to society and will likely do so again. Moreover, his service and related disability must be considered as factors contributing to his crime.

Timothy Oldani had a difficult time adjusting after his tour of duty in Iraq. It affected him so greatly that he was forced to give up his military career. Upon return from Iraq he was diagnosed by the VA with a serious disability (60 percent) based on PTSD and tinnitus. He was also affected by the deaths of two men who served with him in Iraq. It was under these trying conditions that the instant crime was committed. Although hardships in life are not an excuse or free pass to violate the law, they should be taken into account when appropriate. Mr. Oldani has worked hard to address the challenges he faces, and has set himself on a path to a new life – through education and strong family support. He is furthering his education by working towards a Masters in Business Administration, carrying a high grade-point average while working part-time. The five-month term of imprisonment imposed may interrupt his academic progress for only a semester and community confinement will allow him to resume his studies. A long term of imprisonment could easily reverse the progress he has made towards a new life. Consequently a term of imprisonment less than that

recommended in the guidelines is necessary to achieve the purposes of sentencing specified in § 3553.

Another factor weighing in favor a reduced sentence is the low statistical probability of recidivism for defendants like Timothy Oldani – "true first offenders," with no prior criminal convictions or arrests. While his placement within criminal history category "I" gives Mr. Oldani a sizeable benefit based on his lack of criminal history, category "I" can be broken down into further classifications with widely varying rates of recidivism: (a) offenders with no prior arrests or convictions; (b) offenders with prior arrests but no prior convictions; (c) offenders with prior convictions that do not count towards criminal history points; (d) offenders with one criminal history point. *See* U.S. Sentencing Commission, Recidivism and the "First Offender", May 2004 *available at* http://www.ussc.gov/publicat/recidivism_firstoffender.pdf. Based on empirical research, the commission found that a defendant with no prior arrests nor criminal history has only a 6.8 percent chance of recidivism. *Id.* This was the lowest rate of recidivism of any group in the study and sharply lower than the rate of those defendants with prior arrests but no convictions (17.2 percent) or defendants with one criminal history point (22.6 percent). (Defendants with prior convictions that did not count towards a criminal history points had an 8.8 percent rate of recidivism). Based on his status as a true first offender, there is little likelihood that Timothy Oldani will be brought before the criminal justice system in the future. Mr. Oldani is unlikely to again be in a situation where he is tempted to commit another crime. Considering the personal characteristics of the defendant – his exemplary military service, the circumstances surrounding the crime, and his low probability of recidivism –the Court **FINDS** a sentence less than that recommended by the guidelines is appropriate.

### III. The Defendant's Medical Condition Necessitates a Prison Term Less Than that Recommended by the Guidelines.

The service related disabilities suffered by Timothy Oldani – specifically PTSD and TBI – have been referred to as the "signature injuries" of the conflicts in Iraq and Afghanistan. Because of the frequencies with which these injuries occur among veterans, the VA is in a unique position to provide treatment. Timothy Oldani regularly participates in both group and individual counseling sessions. Therapy at the VA is easily accessible to him because he is an employee at the Charleston VA, working approximately 20 hours per week. It is likely that the treatment he has received from the VA has contributed, at least in part, to the positive steps he has made in his life.

The Bureau of Prisons ("BOP") would undoubtedly be able to provide basic treatment for the conditions of PTSD, TBI and tinnitus. *See* Mark Simpson Ph.D., Letter to U.S. Attorney's Office, May 26, 2009, Def.'s Exh. 2 Doc. 36. This treatment, however, would not be equivalent to that which Timothy Oldani could receive from the VA. The BOP is not uniquely situated, as is the VA, to treat the signature injuries from the United States's current military engagements. Counselors at the BOP would be less likely to have received specific training to treat veterans and deal, for example, with the type of events that brought on a soldier's PTSD. Finally, group sessions conducted by the BOP would likely be available to the entire prison population (at least those subject to a specific disability) rather than being limited to veterans. For these reasons the Court **FINDS** that the defendant's medical condition warrants a prison sentence lower than that recommended by the guidelines so that he may benefit, as much as possible, from the treatment provided by the VA.

**IV.    A Sentence of Five Months Imprisonment and Eight Months Community Confinement Is Sufficient, but No Longer Than Necessary to Meet the Sentencing Objectives of 18 U.S.C. § 3553.**

Beginning with an offense level of 19 and a corresponding guideline range of 30 to 37 months and considering the sentencing factors as described above, the Court **FINDS** a sentence of five months imprisonment and eight months community confinement is sufficient but no longer than necessary to satisfy the sentencing objectives of 18 U.S.C. § 3553.

Timothy Oldani committed a serious crime by exporting sophisticated munitions to the highest bidder he could attract on eBay. He knew the items he sold were stolen, and repeated the behavior on multiple occasions. This was not a single act of impulse or bad judgment but a series of decisions that occurred over a number of months. He was a former soldier himself and had to have been aware of the advantages that this type of equipment conferred to the United States military, and conversely the danger which would come to U.S. soldiers if their technological supremacy were compromised. Because of the serious nature of the crime and the need to deter others who might be tempted to commit similar act, a term of imprisonment is necessary.

Even so, there are other facts related to the offense that justify a more lenient sentence. For instance, Oldani did not attempt to conceal his identity or engage in subterfuge to sell and export the items. His email account was readily identified and traceable to him, and he made no effort to hide or launder the proceeds. The Government did not disclose whether there was any investigation as to who purchased the items. Further, despite their inclusion on the Munitions List, the articles apparently are available for purchase over the internet, just not for unlicensed export. Had he not sold some of the stolen items overseas, he would have faced a much lower sentencing range, based the amount of the loss.

Because of the considerations described more fully above – the fact that the sentencing commission acted outside its characteristic role in establishing a guideline range for the offense committed by the defendant, the personal characteristics of Timothy Oldani, and the defendants' need for medical care – a sentence longer than five months would threaten to undermine the purposes of sentencing. The eight month term of community confinement during supervised release will result in significant supervision and restriction on Timothy Oldani for a total period of 13 months. It will, however, allow him to continue his path towards self-improvement with only minimal interruption to his receipt of treatment from the VA and recognizes his prior service and the circumstances surrounding the commission of the offense.

## Conclusion

For the above stated reasons a substantial variance from the sentencing guideline range of 46 to 57 months is justified. The defendant is hereby sentenced to serve five months imprisonment followed by a three year term of supervised release – including eight months of community confinement. This sentence is sufficient but no longer than necessary to meet the sentencing objectives of 18 U.S.C. § 3553. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel and the defendant, the U.S. Attorney's Office, the U.S. Probation Office, and the U.S. Marshal's Service.

ENTER:       June 16, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE